**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| EVONE CLIFFORD, | CASE NO. 5:22-CV-01562-AMK |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| DEPARTMENT OF YOUTH SERVICES INDIAN RIVER JUVENILE CORRECTION FACILITY, | <u>**MEMORANDUM OPINION & ORDER**</u> |
| Defendant. | |

Before the Court is a Motion for Summary Judgment filed by Defendant Department of Youth Services Indian River Juvenile Correction Facility ("DYS").  (ECF Doc. 64).  The matter is fully briefed (ECF Docs. 64, 65, 66) and ripe for review. The parties have consented to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Docs. 21, 22.)  For the reasons that follow, the Court **GRANTS** DYS's Motion for Summary Judgment and dismisses Plaintiff's Amended Complaint (ECF Doc. 16-2) with prejudice.

I.      Background

**A.**    **Procedural History**

Plaintiff Evone Clifford ("Ms. Clifford") filed her initial Complaint pro se on September 2, 2022.  (ECF Doc. 1.)  Following the filing of motions to dismiss by both defendants, the Court granted Ms. Clifford's Motion for Leave to Amend the Complaint Instanter on February 6, 2023

(Marginal Entry Order of Feb. 9, 2023), making the Amended Complaint the operative

Complaint (ECF Doc. 16-2 ("Am. Compl.")).  The parties thereafter consented to the jurisdiction

of the undersigned magistrate judge.  (ECF Docs. 21, 22.)

The Amended Complaint asserts claims of race, sex, and age discrimination, and

retaliation in the workplace against two defendants: DYS and Local 11 Ohio Civil Service

Employees Association AFSME ("OCSEA").  (ECF Doc. 16-2.)  On October 11, 2023, the

Court granted OSCEA's Motion to Dismiss the Amended Complaint, dismissing all claims

against OSCEA.  (ECF Doc. 50.)  By the same order, the Court granted DYS's Motion to

Dismiss in part, dismissing all claims against DYS except the Title VII retaliation claim.  (*Id.*)

DYS now moves for summary judgment on the last remaining claim, retaliation in

violation of Title VII.  *(*ECF Doc. 64.)  In Count IV of the Amended Complaint, Ms. Clifford

alleges DYS took retaliatory actions against her in violation of Title VII because she complained

of discrimination and harassment by her coworkers, with alleged retaliatory acts that include

permitting ongoing discrimination and harassment by her coworkers, disciplining her, and

terminating her.  (Tr. 16-2, p. 7, ¶ 41.)  DYS now moves for summary judgment on that claim.[1]

(ECF Doc. 64.)  This matter is fully briefed and ripe for review.[2]  (ECF Docs. 64, 65, 66.)

---

[1] In addition to filing declarations and documents in support of its motion for summary judgment (ECF Docs. 64-1 – 64-22), DYS also filed sealed (ECF Docs. 62, 63) and unsealed, redacted (ECF Docs. 59, 60) copies of the transcripts and associated exhibits for Ms. Clifford's September and October 2023 depositions, subject to the Court's order permitting the filing of certain exhibits and testimony under seal (ECF Doc. 57).  With the exception of the documents referenced in footnote 3, *infra*, no sealed documents need to be discussed herein.

[2] Ms. Clifford has filed certain unauthenticated documents in support of her brief in opposition.  (ECF Doc. 65-1.) Many of the documents mirror authenticated evidence filed by DYS.  (*See generally* ECF Doc. 50-1 – 50-58; ECF Doc. 60-1 – 60-36; ECF Doc. 64-1 – 64-22.)  DYS has not objected that Ms. Clifford's documents "cannot be presented in a form that would be admissible in evidence" at trial, Fed. R. Civ. P. 56(c)(2), and has thus waived any objection based on admissibility.  *See Mangum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017); *see also Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018) ("As the Sixth Circuit has . . . explained, the appropriate focus under Rule 56, as since amended, is on the admissibility of a fact at trial, not necessarily the admissibility of the fact in the specific form presented at the time of the summary judgment motion[.]") (citing *Mangum*).

## B.     Factual Background

DYS is the state of Ohio's juvenile corrections system; it confines felony offenders aged 10 to 21 years who were adjudicated and committed by a county juvenile court.  (ECF Doc. 64-1 (Declaration of Angela Ziegler ("Ziegler Decl.")), p. 1, ¶ 3.)  DYS has one central office location and three correctional facilities, one being the Indian River facility.  *(Id.)*  Ms. Clifford worked for DYS as a juvenile correction officer / youth specialist ("youth specialist" or "YS") at the Indian River facility from June 12, 1995, until her termination on October 21, 2021.  (ECF Doc. 60 (October 17, 2023 Deposition of Evone Clifford ("Clifford Depo. II")), 24:7-9, 16-25; 25:1-3, 23-25; 31:14-18; ECF Doc. 60-8, pp. 1-2.)

### 1.     Youth Specialist Position, Post Orders, and Pick-A-Post Agreements

Youth specialists "[p]rovide safety, security, custodial care, [and] surveillance" of the juveniles at the facility, and are generally responsible for enforcing and following DYS policies, procedures, rules, and regulations.  (Clifford Depo. II, 25:7-19; ECF Doc. 60-8, p. 1.)  Youth specialists perform their work at various posts throughout the facility.  (Clifford Depo. II, 26:13-16; *see* Ziegler Decl., pp. 1-2, ¶¶ 6-7.)  Ms. Clifford held the position of YS throughout her 26-year career with DYS but worked different posts during that time.  (Clifford Depo. II, 25:8-25; 26:1-20.)  Each YS post at Indian River has its own post orders, which describe the duties, expectations, equipment, and procedures applicable to youth specialists during their shifts.  (Ziegler Decl., p. 2, ⁋ 7; *see* ECF Doc. 60-34, pp. 1-4 (policy document setting forth authority and procedures related to DYS post orders).)  As a youth specialist, Ms. Clifford reported to the operations manager ("OM"), otherwise known as the shift supervisor.  *(Id.* at 39:23-25; 40:1-13.)

As a youth specialist, Ms. Clifford was a union member with OCSEA.  (Clifford Depo. II, 94:4-13.)  OCSEA and DYS had a collective bargaining agreement ("CBA") covering the terms of Ms. Clifford's employment with DYS.  *(Id.*; Ziegler Decl., p. 2, ¶ 8; ECF Doc. 60-18.)

3

Under the CBA, management retained the right to determine matters such as employee work assignments and standards, the quality and quantity of work, and the establishment, expansion, and sequences of work processes. (ECF Doc. 64-2, pp. 2-3.) But Appendix N of the CBA formalized an understanding between DYS and OCSEA that "work area assignments" would be posted with information regarding the classification, exact work area, regularly scheduled days off, and shift, and that affected employees would be canvased in order of institutional seniority after the posting, starting with the most senior, to select preferred work areas. (*Id.* at pp. 27-30.)

In conformity with Appendix N, DYS and the OCSEA entered pick-a-post ("PAP") agreements to govern how employees bid on posts. (*See* Clifford Depo. II, 105:8-16; *see, e.g.*, ECF Docs. 60-19, 60-20 (2016 & 2021 PAP agreements).) Every few years, DYS determined which posts were needed and identified the days off for each post, then went to the OCSEA for union approval. (Clifford Depo. II, 105:8-25.) Attached to and part of the PAP agreements were lists of the posts eligible for employee bids. (*See, e.g.*, ECF Docs. 60-19, 60-20.) Under the PAP agreements, employees bid on their posts by their respective seniority. (Clifford Depo. II 106:6-12; *see, e.g.,* ECF Doc. 60-19, p. 1; ECF Doc. 60-20, p. 1.)

During the time at issue in this case, Ms. Clifford worked as one of two YS posted in the control center, where duties were performed seated at either the desk or the window. (Clifford Depo. II, 34:13-36:14.) The other permanent YS in the control center was Jeff Miller. (*Id*. at 42:3-11.) Both control center employees were responsible for all control center duties, but the employee covering the desk was generally responsible for phones, monitoring cameras, opening gates and doors, and answering radio calls, while the employee covering the window was generally responsible for utilities and equipment needing to be issued to other employees, such

as the radios, cuffs, and keys.  (*Id.* at 34:13-36:14.)  Until August 2020, Ms. Clifford and Mr. Miller rotated between the window and desk positions.  (Clifford Depo. II, 78:7-24, 87:1-8.)

The 2016 and 2021 Indian River PAP agreements listed two standard YS spots for the control center post.  (ECF Doc. 60-19, p. 7; ECF Doc 60-20, p. 6.)  The 2021 agreement also listed a third YS spot which was designated as "relief."  (ECF Doc 60-20, p. 6.)  The two standard control center spots were not differentiated from one another—e.g., as "desk" or "window."  (ECF Doc. 60-19, p. 7; ECF Doc 60-20, p. 6.; ECF Doc. 59 (September 25, 2023 Deposition of Evone Clifford ("Clifford Depo. I")), 63:6-25, 66:1-2.)  Before 2016, Ms. Clifford testified that there were two distinct control center posts on which youth specialists could bid, one for control center window and the other for control center desk.  (Clifford Depo. I, 64:6-23.)

### 2.     Conflict Over DYS Adding Third YS Post to Control Center

In the spring or summer of 2020, DYS changed the control center "relief" position to a permanent position with a third employee at the control center post.  (Clifford Depo. II, 44:5-14.)  Superintendent James Darnell and Direct Deputy Charles Wilson told Ms. Clifford the change was made because of the COVID-19 pandemic.  (*Id.* at 44:12-23.)  The change was informal, with no changes to the PAP or post orders.  (*Id.*)   Other institution-wide changes to job duties were imposed around the same time.  (*Id.* at 19:4-24.)  Herman Horner was the youth specialist assigned to the control center "relief" position during Ms. Clifford's shifts, and he became the permanent third person added to the control center after the change.  (*Id.* at 44:8-11; 45-9.)

Although the change was made in response to the pandemic, Ms. Clifford believed three people could not fit in the control center while maintaining social distancing.  (Clifford Depo. II, 45:5-9.)  She complained about this issue to then-Chief Inspector Ginine Trim in a June 24, 2020 email.  (*Id.* at 19:14-25; ECF Doc. 60-12, p. 51.)  Ms. Clifford wrote, in pertinent part:

On April 23, 2020 Indian River Administration purged our Union Pick-A-Post contract. They eliminated most of the officer's posts/positions. . . .

One of these created posts was a 3rd in the control center on all 3 shifts. Our P-A-P agreement only allowed for 2 staff per shift because the control center is enclosed with limited space.

I work the control center on day shift and was very concerned that the limited space would not allow for social distancing per the governor's orders.

I voiced my concern to my immediate supervisor.

The 3rd staff was removed for the control center on afternoon and midnight shift.

I am a 65 year old African American female with documented health issues! Why would they remove the 3rd staff from every shift but mine?

It's because I spoke up. Another female staff who refused to leave her post after they back-filled it (eliminated it then put someone else on it) was told she was going to be charged with insubordination. This institution is not someone's personal mancave.

(ECF Doc. 60-12, p. 51.)  After Ms. Clifford sent this email, Mr. Horner was removed from the control center and put back in the relief pool.  (Clifford Depo. II, 19:14-25.)

Ms. Clifford testified that following her complaint, Mr. Miller started harassing her and Mr. Horner started "to make little comments." (Clifford Depo. II, 85:6-22.)  For example, when Mr. Miller was at the window, he turned on training videos at a loud volume, which interfered with Ms. Clifford's ability to hear the radio traffic coming in.  (*Id.* at 85:22-86:4.)  Ms. Clifford asked Mr. Miller to use an earpiece and even told him who to ask for an earpiece, but he continued to listen to loud training videos without an earpiece.  (*Id.* at 86:2-17.)

In August of 2020, because of Mr. Miller's continued refusal to use an earpiece to listen to training videos, Ms. Clifford told Mr. Miller she was going to stop rotating between the desk and window positions in the control room.  (Clifford Depo. I, 14:8-15:1; Clifford Depo. II, 85:2-22, 86:5-23.)  She stopped the rotation because she knew Mr. Miller did not like working the window, he had been harassing her, and she "figured the only thing that . . . [she] had going for

[her] was [her] seniority." (Clifford Depo. I, 14:21-15:1; Clifford Depo. II, 85:13-16.)  She believed she had authority to stop the rotation because of her seniority, explaining at her depositions that senior staff had the authority to determine what job they were working for every post that had two or more staff, and noting that a senior staff member for the midnight shift in the control center also did not rotate positions. (Clifford Depo. I, 15:2-17; Clifford Depo. II, 87:14-89:1.)  She explained that stopping the rotation was her "way of fighting back" against the harassment, and said she was "taking up for [her]self." (Clifford Depo. I, 14:21-15:1; Clifford Depo. II, 89:2-4.)  When asked if it was her "way of getting back at Miller and Horner," she testified: "Correct.  Miller." (Clifford Depo. II, 89:5-7.)

### 3.    September 2020 Control Center Incident & Internal Investigation

On September 2, 2020, an incident occurred between Ms. Clifford and Mr. Horner in the control center. (Clifford Depo. II, 50:23-55:4.)  Ms. Clifford testified that Mr. Horner was sitting at the control center desk when she arrived; he told her that Mr. Miller had called off work and that he was at the desk because it was Mr. Miller's "day to work at the desk." (*Id.* at 51:17-19; 89:13-18.)  Ms. Clifford did not believe he had the authority to choose the desk because she had seniority and because Mr. Horner was relief staff, not permanent staff. (*Id.* at 89:9-90:2.)

Ms. Clifford told Mr. Horner that she had the desk; but Mr. Horner would not get up from the desk, so she called the shift supervisor. (*Id.* at 51:13-22.)  Shift supervisor Demarlo Rozier, told Mr. Horner several times to get up and go to the window position, but Mr. Horner said he would not get up until Superintendent Darnell came. (*Id.* at 51:21-52:23.)  A shift change was underway at the time, and people were in the sally port waiting for the person at the desk position to let them out; Mr. Rozier told Mr. Horner "I got to get these people out of here." (*Id.* at 53:5-13.)  Eventually, Mr. Rozier told Mr. Horner: "if you're not going to get up and go to

your post, . . . go sit in the lobby." (*Id.* at 54:13-17.) Mr. Horner got up and sat in the lobby. (*Id.* at 54:18.) Another staff member briefly covered the window position, but Mr. Horner returned and took the window position 15 to 20 minutes later. (*Id.* at 54:19-55:4.)

On September 14, 2020, Ms. Clifford submitted two incident reports, one relating to the "week of August 24, 2020" (ECF Doc. 59-15; ECF Doc. 60-12, pp. 13-15) and one regarding the September 2, 2020 incident (ECF Doc. 60-12, pp. 17-22). In the first report, she said Mr. Horner intentionally left his bags at her workstation in the control room during the week of August 24, 2020, to provoke an argument; she also asked management to check the parking lot camera footage from August 20, 2020, when Mr. Horner reportedly backed his car toward her. (*Id.* at pp. 13-15.) In the second report, she described her dispute with Mr. Horner in the control room on September 2, 2020, and added that Mr. Horner made mumbled comments upon returning to the control center that day, like "God doesn't like ugly," "mean," and "evil". (*Id.* at pp. 17-22.)

Operation Manager Rozier also submitted an incident report regarding the September 2 incident, which was dated September 15, 2020. (ECF Doc. 60-12, pp. 1, 23-25.) In discussing the incident, he explained that he told Mr. Horner to work the window because Ms. Clifford "is permanent CC staff and she has more seniority than him." (*Id.* at p. 24.) Operation Manager Brian Jeter and Mr. Horner also submitted incident reports regarding the September 2 incident, which were dated September 15, 2020. (*Id.* at pp. 1, 26-27, 30.)

On October 26, 2020, nearly two months after the September 2 incident, Ms. Clifford sent an email to Deputy Director Ginine Trim, attaching copies of her September 14, 2020 incident reports. (*See* ECF Doc. 60-12, p. 50.) In the email, Ms. Clifford wrote:

> On September 14, 2020, I turned in a five-page two-sided statement to my immediate supervisor.
>
> The statement was on an incident that occurred on September 2, 2020 between me and a co-worker in the communication center.

My co-worker physically and verbally prevented me from taking my post.

He refused a direct order to give me my post and to assume his post.

His action caused some staff to be locked in the sally-port and others were unable to enter or leave the building.

On October 15, 2020 I talked to the FIA. He said he did not know about my statement.

Seven weeks since the incident and nothing has been said or done.

Although not as blatant, my co-worker continues to "play games" whenever he works with me.

Why is this behavior allowed to go unchecked?

(*Id.*)

A Report of Investigation ("ROI") reflects that DYS thereafter initiated an investigation into the September 2020 incident, assigning Human Services Program Administrator 2 Andrea Graham to the investigation on October 29, 2020. (ECF Docs. 59-14; 60-12.) The materials reviewed by Ms. Graham included the September 2020 incident reports from Ms. Clifford, OM Rozier, OM Jeter, and Mr. Horner. (ECF Doc. 60-12, p. 1.) Ms. Graham also considered a more recent incident report from Mr. Miller, dated October 28, 2020. (*Id.* at pp. 1, 25.) Mr. Miller wrote that Ms. Clifford had told him two months prior that she would no longer work the window and was "using her seniority to pick the desk"; he said he had worked the window every day since. (*Id.* at p. 25.) He explained that Ms. Clifford was upset because he had played a training video and, when she told him it was too loud, he said "ok" and laughed. (*Id.*)

In her investigation, Ms. Graham reviewed video footage from August 20 and September 2, 2020, and interviewed witnesses. (Clifford Depo. II, 50:23-25; ECF Doc. 59-14, pp. 1-3; ECF Doc. 60-12, pp. 1-7, 11, 33-39, 41-43, 46-49.) OM Rozier was interviewed regarding the September 2 incident. (ECF Doc. 60-12, pp. 2, 34-35.) When asked if the senior staff member

can choose what control center duty to perform, OM Rozier answered: "For the most part, everything around here is seniority driven.  Additionally, Ms. Clifford is permanent staff and Mr. Horner is Control Center/Relief.  For this reason, I told Mr. Horner that Ms. Clifford would take the desk for the day."  (*Id.*)  When asked if Ms. Clifford or Mr. Horner were yelling, screaming, calling each other names, or being threatening, OM Rozier answered: "No they were just being really firm towards each other."  (*Id.*)  OM Jeter also said in his interview that Ms. Clifford could choose where to work in the control center because she had seniority.  (*Id.* at pp. 2, 36-37.)

In his interview, Mr. Horner said he objected to stopping the rotation of duties in the control center because that was not how he was trained; but he admitted that staff working on the same post in other areas of the facility allowed the person with the most seniority to choose how the duties on the post would be assigned.  (*Id.* at pp. 5-6, 46-48.)  He described his perspective on the incidents and denied any intent to antagonize or intimidate Ms. Clifford.  (*Id.*)

In her interview, Ms. Clifford described the September 2 incident.  (ECF Doc. 60-12, pp. 3-5, 41-43.)  When asked about her professional relationship with Mr. Horner, she reported that he got upset when she said they did not need three permanent staff in the control center and began to do "small petty things" like putting his bag in her workspace and telling her not to touch his things and reversing his car toward her in the parking lot.  (*Id.* at pp. 4, 41.)  She reported that Mr. Miller, Mr. Ackley, and Mr. Horner always gave her a hard time and played games, like leaving garlic beef sticks in the trash can and mixing up the equipment.  (*Id.*)  She said the behavior had been going on for years from Mr. Miller and Mr. Ackley "because they were targeting the black female staff" even before Mr. Horner stared working control.  (*Id.* at pp. 4, 41-42.)  When asked if she felt threatened by Mr. Horner, she answered yes, that she felt threatened when he told her not to touch his things and refused to get up from the desk, she felt

10

she was being bullied into going to the window, and she felt Mr. Horner was intentionally intimidating her when he backed his car toward her in the parking lot.  (*Id.* at pp. 4-5, 42-43.)

DD Wilson was interviewed as an "expert witness."  (ECF Doc. 60-12, p. 7.)  When asked whether seniority is used to determine which specific duties staff perform within a post, he answered: "No.  Duties should be rotated in order for work to be fairly distributed."  (*Id.* at pp. 7, 49.)  It was his opinion that Ms. Clifford did not have the right to choose to work the panel in the control center every day based on her seniority alone.  (*Id.*)

Ms. Graham watched video from the parking lot incident between Ms. Clifford and Mr. Horner and found that the footage substantiated Mr. Horner's claim that he reversed his car to speak to a vending machine worker.  (ECF Doc. 60-12, pp. 6-7.)  Ms. Graham noted that Ms. Clifford's car was "a distance away" when Mr. Horner reversed.  *(Id.* at p. 7.)  She also reviewed the applicable Workplace Violence Prevention policy, which defined Workplace Violence as:

- Any act or threat of physical, verbal or psychological harm. Workplace violence includes, but is not limited to, the following:

  - All threats or acts of violence occurring on state property, regardless of the relationship between the state and the individual involved in the incident;

  - All threats or acts of violence not occurring on state property, but involving someone who is acting in the capacity of a representative for DYS;

  - All threats or acts of violence not occurring on state property, but involving an employee of DYS if the threats or acts of violence affect the legitimate interests of the state;

- Any threats or acts of violence resulting in the conviction of an employee or agent of DYS, or of an individual performing services on the department's behalf on a contract or temporary basis, under any criminal code provision relating to threats or acts of violence that adversely affect the legitimate interests of the state.

(*Id.*)

Ms. Graham submitted her investigation for review on November 24, 2020, but it was returned to her for further investigation of Ms. Clifford's allegations that she had been targeted

by Mr. Miller and Mr. Ackley.  (ECF Doc. 60-12, p. 7.)  She conducted additional interviews in December 2020.  (*Id.* at pp. 7-12, 52-54, 56-58, 60-64.)

Operation Manager Khristi Cunningham was interviewed twice.  (*Id.* at pp. 1, 8-9, 52-54.)  OM Cunningham recalled Ms. Clifford's prior reports about being targeted by male staff because she was an African American female; she said she forwarded Ms. Clifford's complaint to Superintendent Darnell via email at the time, but he did not respond.  (*Id.* at p. 52.)  A review of that 2017 email showed Ms. Clifford reported being targeted by Mr. Miller and Mr. Johnson, who worked in control at the time.  (*Id.* at pp. 8, 53.)  When asked if she believed Ms. Clifford was being targeted, OM Cunningham said she did; she explained that Mr. Miller had a history of targeting females, including OM Cunningham herself; OM Cunningham believed females were "targeted period" and were "allowed to be messed with without any repercussions."  (*Id.* at pp. 9, 53.)  OM Cunningham's prior conflicts with Mr. Miller involved him moving cameras and throwing away her chits; she said she reported those issues to DD Wilson, but nothing was ever done about it.  (*Id.* at 9-10, 53.)  When asked if she had anything to add, OM Cunningham stated: "There are issues that are long standing that have not been addressed regarding females being targeted.  They are reported but they are laughed at and not being taken seriously.  Little things are not being addressed and they lead to big things."  (*Id.* at pp. 10, 53-54.)

Mr. Miller and Mr. Ackerly were also interviewed.  (ECF Doc. 60-12, pp. 8-9, 56-58, 60-61.)  Mr. Miller offered his own explanations for prior incidents between him and Ms. Clifford, including his listening to training without earplugs and disputes regarding trash left in the control center.  (*Id.* at pp. 8-9, 56-58.)  He denied purposely trying to aggravate or target Ms. Clifford.  (*Id.*)  When asked if he heard that black female staff were being targeted by white male staff, he said he had not heard of it, and that: "I could state that I am being targeted because I am a white

male." (*Id.*)  Mr. Ackerly gave his own explanations for prior interactions with Ms. Clifford, including reports of trash left in the trash can and equipment being mixed up, and said he had never done anything to purposely aggravate or target Ms. Clifford.  (*Id.* at p. 9, 60-61.)

DD Wilson was re-interviewed regarding prior conflicts between OM Cunningham and Mr. Miller, and said those issues were addressed with Mr. Miller and resolved.  (ECF Doc. 60-12, pp. 10, 62.)  Superintendent Darnell was interviewed regarding prior conflicts between Ms. Clifford and Mr. Miller but said he was not the superintendent at the time and did not address those conflicts.  (*Id.* at pp. 10, 63.)  When asked about statements from Ms. Clifford and OM Cunningham that African American women and women in general were being targeted, Mr. Darnell said he did not believe women were being targeted and had not read anything that would prove they were being targeted.  (*Id.*)

After her investigation was complete, Ms. Graham's final conclusions were as follows:

- The allegation that on 9/2/20, an incident of Workplace Violence occurred in the Control Center between Mr. Horner and Ms. Clifford was unsubstantiated;

- The allegation that Mr. Horner failed to comply with instructions given to him by Mr. Rozier to work at the window of the control center and allow Ms. Clifford to work at the panel on 9/2/20 was unsubstantiated;

- The allegation that Mr. Horner intentionally attempted to back into Ms. Clifford's vehicle on 8/20/20 was unsubstantiated; and

- The allegations made by Ms. Clifford during the course of the investigation that she was being targeted, threatened, and the victim of workplace violence by Mr. Ackley, Mr. Horner, and/or Mr. Miller were unsubstantiated.

(ECF Doc. 59-14, p. 1; ECF Doc. 60-12, pp. 11-12.)

Ms. Graham finalized the ROI on January 4, 2021, and it was signed by Superintendent Darnell on January 19, 2021.  (ECF Doc. 60-12, p. 12.)  Superintendent Darnell gave Ms. Clifford and Mr. Horner workplace violence letters to sign and directed both to follow policy guidelines.  (Ziegler Decl., p. 2, ¶ 9; ECF Doc. 60-13, p. 3; ECF Doc. 64-3, pp. 1-2.)

### 4. January 20, 2021 Internal Complaint and Investigation

On January 20, 2021, Ms. Clifford filed an Incident Report outlining several issues she had with Mr. Horner while working in the control center on January 18, 2021.  (ECF Doc. 60-13, pp. 3, 20-25.)  Specifically, she said Mr. Horner: did not make sure that radios were turned off when staff turned them in, leading to feedback in the control room; moved the key tree in front of the window, obstructing her view of staff ID badges; listened to music in the control center at various volumes throughout the shift; and stood close behind her to look at a monitor after a signal had been called, staying behind her for a lengthy period of time.  (*Id.*)  Ms. Clifford alleged that these actions made her feel "uncomfortable, agitated, and annoyed."  (*Id.*)

Philip Born, a Principal Investigator in the Chief Inspector's Office of DYS, was assigned to investigate the complaint.  (*See* ECF Doc. 64-21 (Declaration of Phillip Born ("Born Decl."), p. 1, ¶¶ 1, 2.)  The investigation began on February 1, 2021, concluded on March 2, 2021, and was reviewed by Ms. Trim on March 16, 2021.  (ECF Doc. 60-13, pp. 2, 11.)  During the investigation, Mr. Born interviewed Ms. Clifford and Mr. Horner, reviewed documents, and spoke with witnesses.  (*Id*. at pp. 1-11, 26-34.)  In her interview, Ms. Clifford admitted that the post orders did not require staff to ensure that radios were turned off and did not dictate where the key tree was placed; she also said she did not discuss any of the issues documented in her complaint with Mr. Horner.  (*Id.* at pp. 6-7, 26-28.)  She admitted that Mr. Horner did not make threatening statements to her but said she believed the situation involved workplace violence because it was "all part of a situation that stemmed from [the] September incident."  (*Id.*)

After reviewing video of the control center, Mr. Born observed that the closest Mr. Horner stood to Ms. Clifford was a few feet away.  (Born Decl., p. 2, ¶ 9.)  Ms. Clifford reported that he stood about five feet away, and Mr. Horner reported that he stood six or seven feet away.  (*See* ECF Doc. 60-13, pp. 7, 9, 27, 30.)  Ultimately, Mr. Born found no evidence that Mr. Horner

14

physically touched, harmed, or verbally threatened Ms. Clifford. (Born Decl., p. 2, ¶¶ 8, 10; ECF Doc. 60-13, p. 10.) He concluded that Mr. Horner had not violated the workplace violence policy, but that Mr. Horner had violated policy by listening to music in the control center. (Born Decl., p. 2, ¶ 8; ECF Doc. 60-13, pp. 10-11.)

On February 10, 2021, in a meeting attended by several DYS administrators and the union president and vice president, Ms. Clifford was told by DYS administrators that the investigation into her January 2021 complaint about Mr. Horner's actions was complete and that her claims were found to be unsubstantiated. (Clifford Depo. II, 80:20-25; 81:1-5.)

### 5.   DYS Modifies Control Center Post Orders

The post orders for the control center were modified in February and March 2021. (ECF Doc. 64-8 (Declaration of Chris White ("White Decl.")), p. 1, ¶ 8; Clifford Depo. II, 72:22-25, 76:25-77:18.) Ms. Clifford was told on January 25, 2021, that there would be post order changes for the control center; she later received copies of updated post orders dated February 10 and March 3, 2021. (Clifford Depo. II, 76:25-77:18.) She was told the post orders were changed to put in a "rotation" between the window and desk positions in the control room because she "had stopped the rotation and said [she] was going to take the desk" position. (*Id.* at pp. 77:22-78:1.) Ms. Clifford believed the changes were made to target her and asserted that she previously filed complaints or grievances against the administrators who made the changes. (*Id.* at p. 156:16-23.)

The revised control center post orders added the following language:

To create balance of duties and prevent disparity while posted in the Control Center, the Operations Managers will implement a standard weekly rotation between the permanent CC Youth Specialist; the Operations Administrator will provide oversite [sic] of the schedule. This rotation will consist of coverage on the Control Desk and Monitoring the Employee/Visitor Sally Port Window and security equipment/key/radio distribution.

(ECF Docs. 64-10, p. 49; 65-1, p. 16.)[3] DD Wilson later submitted an incident report dated

March 22, 2021, explaining the rationale for changing the control center post orders. (ECF Doc.

60-23, p. 1.) He said the post orders were changed to ensure a balance of duties and prevent

disparities between staff assigned to the control center, explaining:

> There had been complaints about staff not being permitted to utilize the control
> board because they weren't senior employees; this was happening on first and third
> shift only. The first shift staff posted in the Control Center were having a
> disagreement on a daily basis, which was interfering with the daily functions of the
> facility. . . . To prevent any further allegations of workplace violence or disparity
> between staff, a revision to the post orders was implemented by OA Chester and
> DD Chuck Wilson. . . . [T]he Operation Managers were tasked to assign schedules
> daily.

(*Id.*) The new post orders applied to all permanent youth specialists working in the control center,

during all four shifts. (Clifford Depo. II, 128:19-23.)

### 6. Internal EEO Investigation

On February 18, 2021, Ms. Clifford contacted DYS Assistant Director Julie Walburn via

email, alleging that she was "locked out" of her control center post when the DD revised the post

orders and gave her post to a white male coworker with less seniority; she also alleged ongoing

harassment from two coworkers. (Clifford Depo. I, 55:6-25; ECF Doc. 59-20.) On February 23,

2021, DYS Labor Relations Officer 2 Annie Person was assigned to conduct an internal EEO

investigation into Ms. Clifford's allegations that she was harassed by two coworkers due to her

age and gender. (White Decl., p. 2, ⁋ 9; ECF Doc. 64-13.)

Ms. Person interviewed Ms. Clifford, Mr. Miller, and Mr. Horner, and reviewed

documentation that included emails and incident reports. (ECF Doc. 64-13.) In her interview,

---

[3] The cited document was attached to an internal investigation report and Ms. Clifford's brief in opposition, and
includes only the page from the March 3, 2021 post orders with the newly added language. The complete post
orders for February and March 2021 were submitted by DYS under seal and match the portion of the document cited
above. *See* ECF Doc. 63-5, p. 14 (2/16/21 post orders); ECF Doc. 63-6, p. 14 (3/3/21 post orders).

Ms. Clifford asserted that Mr. Miller: watched training videos with the volume turned up, without an earpiece; went to the restroom during the early morning rush; did not clean when he worked with Ms. Clifford; and adjusted the temperature to make it uncomfortable, although she noted they "worked out an understanding about the temperature." (ECF Doc. 64-13, pp. 1-3, 9-11.)  She asserted that Mr. Horner: did not move from the desk position when working relief, even after OM Rozier told him to go to the window; left his bag on Ms. Clifford's desk, then told her not to touch his stuff when she moved it; left radios on in the control center; moved the key tree to block her view to verify staff; and stood behind her in a way that made her uncomfortable, not moving when she said "excuse me." (*Id.*)  When asked to explain what she meant when she said she was harassed because she was the oldest and only female in the control center, she said:

> When Mr. DeGordon came into the control center on third shift a year ago no one said anything when he stopped the rotation but when I stopped the rotation Mr. Miller and Mr. Horner was upset. That is when the DD Wilson rewrote the post orders to accommodate them.

> Also, when Mr. Horner stood over me while I was at the desk. He came and stood behind me when I turned the video on for the incident. I changed the picture thinking he would move. I got up because I was feeling uncomfortable. I went to put my cup in my bag and I said excuse me, but he just stood there.

(*Id.* at pp. 3, 11.)

Ms. Person's concluded her investigation on March 25, 2021, finding Ms. Clifford's allegations of harassment due to race and gender were unsubstantiated, specifically finding:

- YS Evone Clifford did not provide any evidence that she was being harassed due to her age or race.

- YS Evone Clifford shared information of incidents that had been investigated on two different occasions locally and by CIO that concluded to be unsubstantiated.

- Deputy Direct Charles Wilson explained in his statement that the reason for the Post Order update was due to the staff on 1st shift and 2nd shift were not allowing less senior staff an opportunity to share the duties and to prevent any other disparities on shift.

- Pick-a post allows staff to pick their post by seniority. When staff is granted the post, they are all responsible for the duties of the post. Management has a right to write Post Orders that help manage the post.

(*Id.* at p. 7.)

### 7.    February and March 2021 Grievances

On February 22, 2021, Ms. Clifford submitted a grievance to the Ohio Department of Administrative Services ("ODAS"), challenging the revision and implementation of the new post orders for the control center.  (Clifford Depo. I, 14:3-5; ECF Doc. 59-4.)  In the grievance, she described her prior actions to stop the rotation of positions in the control center "in response to years of harassment from [her] white male coworker" in August 2020, asserted that another co-worker "tried to bully and intimidate [her] into going back to the rotation" in September 2020, and said she was told that the investigation into her allegations of workplace violence were found unsubstantiated, but was not given written documentation from the investigation.  (ECF Doc. 59-4, p. 2.)  She asserted that DD Wilson told her on February 22, 2021, that her coworker would not be reassigned and alleged that DD Wilson "deliberately targeted [her], and by his actions and inactions has stripped [her] of [her] post and seniority to pacify [her] male co-workers" by "[f]orcing [her] to choose between working in an environment where [she didn't] feel safe . . . or going home without pay."  (*Id.*)  By way of relief, she asked that the prior post orders remain in effect, that DD Wilson not contact her, and that she be restored or approved for the days she left work "due to their refusal to follow the workplace violence policy."  (*Id.*)

On March 4, 2021, Ms. Clifford submitted a second grievance, asserting that DYS personnel had improperly denied several leave requests in February 2021.  (Clifford Depo. I, 65:21-66:3; ECF Doc. 59-24.)  In that grievance, she noted continued concerns regarding the changed control center post orders, the investigation of workplace violence for which she was not provided a written conclusion, and a "hostile work environment" resulting from the modified

18

post orders.  (ECF Doc. 59-24, p. 2.)  She specifically challenged the denial of her requests for vacation leave time "[o]n days I refuse to work with my co-worker because I feel unsafe, and the days I am locked out of my post because the shift supervisor has given it to another one of [sic] coworkers."  (*Id.*)  She reported that OM Jamieson told her only FMLA or sick leave would be approved for those days, and that her requests for vacation leave were "refused/denied because [they] did not meet the timeline."  (*Id.*)

Records indicate that a "Step 2 meeting" was held on June 29, 2021, to address the two grievances.  (ECF Doc. 59-4, pp. 2-3; ECF Doc. 59-24, p. 3.)  The issues addressed were: whether DYS violated the CBA by modifying control center post orders; and whether DYS appropriately denied Ms. Clifford's requests for leave on the dates in question.  (*Id.*)  As to the first issue, the grievance was denied at step two based on a finding that the changes to the post orders did not violate or deviate from the PAP agreement.  (ECF Doc. 59-4, p. 3.)  As to the second issue, the grievance was denied with a finding that Ms. Clifford was assigned to work in the control center and did not have permission to abandon her post.  (ECF Doc. 59-24, p. 3.)

Ms. Clifford filed a third grievance on March 29, 2021, asserting that she was given a verbal and written direct order to report to her assignment in the control center on March 22, 2021, and that she responded by stating that "the control center is [her] post and [she] refused to go to an assignment."  (Clifford Depo. I, 69:4-70:3; ECF Doc. 59-26.)  She also asserted that she had been given direct orders to work at her post in the control center with a coworker regarding whom she had written statements reporting workplace violence, despite her statements that she felt unsafe working with him.  (ECF Doc. 59-26, p. 2.)  She also complained of repeated denials of her leave requests.  (*Id.*)  The grievance records suggest a meeting was scheduled for September 2, 2021, but contain no further details regarding the meeting.  (*Id.*)

19

On December 9, 2021, the grievance records indicate that Ms. Clifford's three grievances were "Carried Forward to Arbitration."  (ECF Doc. 59-4, p. 3; ECF Doc. 59-24, p. 3; ECF Doc. 59-26, p. 3.)  Thereafter, in letters dated April 15, 2022, OCSEA informed Ms. Clifford that the OCSEA Arbitration Committee had reviewed the three grievances, determined that there was not a violation of the CBA, and declined to move the grievances forward to arbitration.  (Clifford Depo. I, 65:5-14, 68:18-69:1, 70:8-15; ECF Docs. 59-23, 59-25, 59-27.)

### 8.      OCRC Investigation and Determination

Ms. Clifford also filed a complaint of discrimination with the Ohio Civil Rights Commission ("OCRC") on February 23, 2021, alleging discrimination based on race, color, sex, age, and retaliation occurring on September 2, 2020, and January 18, 24, 25, and February 10, 2021.  (Clifford Depo. II, 13:18-14:13; ECF Doc. 60-3.)  DYS filed an EEO Position Statement in response to the complaint, which was signed by DYS Labor Relations Officer / EEO Manager Brad Nielsen on April 6, 2021.  (White Decl. pp. 1-2, ¶ 6; ECF Doc. 64-9.)  On August 19, 2021, the OCRC issued a Letter of Determination finding based on its own investigation that it was not probable that DYS had engaged in an unlawful discriminatory practice and dismissing the matter. (Clifford Depo. II, 15:6-25; ECF Doc. 60-5.)

### 9.      Ms. Clifford Leaves Facility Without Permission When Directed to Work the Control Center Window Position or to Work in the Control Room with Mr. Horner, Leading to her Suspension and Later Termination

Once the new post orders were in place, Ms. Clifford testified that she refused to work the window position in the control center, even when directed by her supervisor to do so.  (Clifford Depo. II, 100:11-101:11, 102:2-12.)  She still arrived at work and went to roll call, but if her supervisor directed her to work in the window position, she said her seniority entitled her to choose the desk position and that the rotation violated her union contract.  (*Id.*)  If directed to work in the window position, she clocked out and left the facility, and asked to use her accrued

vacation days for the missed shifts.  (*Id.* at 101:7-102:2, 102:13-14.)  Ms. Clifford's requests for

vacation time were denied, but she acknowledged that employees were supposed to request

vacation days seven days in advance and that it was within the discretion of her shift supervisors

to deny her day-of requests.  (*Id.* at 102:13-103:10; 131:14-132:6.)  She was not told why her

requests were denied, but assumed it was because she did not put in her requests on time.  (*Id.* at

104:18-105:7.)  Ms. Clifford was told her departures could lead to discipline and acknowledged

that she did not have the authority to leave the facility.  (*Id.* at 112:1-8.)  But she said she could

not be given a direct order not to leave if, for example, she was sick.  (*Id.* at 112:8-19.)

Ms. Clifford testified that on other occasions she left the premises because she was

directed to work in the control room with Mr. Horner, saying she did not feel safe working with

him.  (Clifford Depo. II, 112:8-19, 113:14-18.)  Her leave was also not approved on those days.

(*Id.* at 113:14-18.)  Her stated reasons for not feeling safe working with Mr. Horner included the

radios being left on, causing feedback, Mr. Horner standing behind her at the desk, and Mr.

Horner saying things like "God don't like ugly and just mean, evil."  (*Id.* at 113:19-117:6.)  She

acknowledged that he did not put his hands on her or physically harm her.  (*Id.* at 116:10-14.)

On March 10, 2021, Unit Manager Lorie Lee was assigned to investigate allegations that

Ms. Clifford was insubordinate when she failed to follow direct orders to report to and/or remain

at her assigned post on March 4, 7, 9, 10, and 11, 2021, instead clocking out and departing the

grounds.  (*See* White Decl. p. 2, ¶ 7; ECF Doc. 64-10.)  As a part of the investigation, Ms. Lee

interviewed witnesses and reviewed relevant documents.  (ECF Doc. 64-10, pp. 1-5.)  The

investigation revealed that Ms. Clifford told supervisors on March 7 and 10 that she would not

report to her post because she felt unsafe working with Mr. Horner.  (*Id.* at pp. 3-4, 15, 21, 23,

42.)  On the other days, she told supervisors she had been "locked out of her post" because Mr.

Miller was working the desk position, which she felt she was entitled to choose based on her

seniority.  (*Id.* at pp. 3-4, 17, 19-20, 25-26, 28, 38-39, 41-43.)  In her March 20, 2021 interview,

OM Cunningham noted that clarification regarding the outcome of the prior investigation would

reduce conflict and confusion, noting: "Giving a direct order to a staff, who repeatedly reports

she feels unsafe and targeted, to assume her post, contradicts policy."  (*Id.* at pp. 38-39.)

In her June 3, 2021 Report of Investigation, Ms. Lee found the allegations of

insubordination against Ms. Clifford to be substantiated.  (*Id.* at pp. 1, 5.)  Ms. Lee made the

following findings in support:

- YS Clifford, during her interview, acknowledged that she was aware that she was refusing to follow direct orders given by her supervisors.

- Witness interviews corroborate that YS Clifford refused direct orders given by supervisors to report to her post, clocking out and leaving grounds.

- YS Clifford, in her own admission, states that she "told" Operations that she was leaving.

- YS Clifford "telling" Operations does not imply permission; the Control Center is a (2) person post, therefore when YS Clifford informed Operations that she was leaving, they would be required to replace her.

- Kronos report confirming that YS Clifford departed shift on dates in question.

- Control Center Post Order (page 13) signed/dated 3/3/21, identifying expectations related to rotation in the control center.

- Control Center Post Order signature sheet indicating YS Clifford's acknowledgement with her initials on 3/3/21 & 3/8/21.

- Most current PAP agreement (2016) and PAP addendum (2017) identifies (3) posts in the Control Center as: Control Center, Control Center and Control Center/Relief and does not identify Control Center desk and/or Control Center Window as specific posts.

(*Id.* at p. 5.)

Via a letter that Ms. Clifford signed as received on June 30, 2021, DYS imposed a five-

day working suspension on Ms. Clifford because she "refused to take [her] post and left

work/grounds without authorization" on five dates in March 2021, and was "insubordinate to

22

supervisory direction and abandoned [her] post" on each of those dates.  (Clifford Depo. II, 132:15-23, 133:23-25; ECF Doc. 60-22, pp. 1-2.)  Ms. Clifford filed a grievance regarding the suspension, but it was not timely filed.  (*Id*. at 133:5-12.)

Despite her five-day suspension, Ms. Clifford continued to leave the facility without authorized leave when she was assigned to work the control center window, despite direct verbal and written orders to report to her post in the control center.  (*Id*. at 136:19-137:19.)  Specifically, Ms. Clifford left the facility on June 8, 10, 15, 17, 22, 24, 29, and July 1 and 6, 2021, despite direct orders to report to and/or remain at her assigned post.  (*Id.* at 136:19-24; ECF Doc. 60-25.)  Her reasons for doing so remained the same.  (Clifford Depo. II, 136:9-23.)

On July 6, 2021, Social Worker Supervisor 1 Dena Freeman was assigned to investigate allegations of insubordination relating to Ms. Clifford leaving the facility without leave on those June and July 2021 dates.  (*See* White Decl., p. 2, ⁋ 10; ECF Doc. 64-14.)  As a part of the investigation, Ms. Freeman interviewed witnesses and reviewed relevant documents.  (ECF Doc. 64-14, pp. 1-4.)  In a Report of Investigation dated August 5, 2021, Ms. Freeman found the allegations that Ms. Clifford "was insubordinate and failed to follow direct orders given by her supervisors to report to her assigned post" and "refused to comply with said direct orders, failed to remain on duty and exited the facility" on the specified June and July 2021 dates was substantiated.  (*Id.* at 1, 4-5.)  Ms. Freeman's findings in support mirrored the findings in the prior June 2021 Report of investigation.  (*Id.* at 4-5; *see* ECF Doc. 64-10, p. 5.)

A letter scheduling a pre-disciplinary meeting with Ms. Clifford for Thursday, September 30, 2021, was sent to Ms. Clifford's home address via certified mail on September 20, 2021.  (White Decl. p. 2, ⁋12; ECF Doc. 64-15.)  Ms. Clifford was charged with violating the following DYS rules: (1) Rule 4.01 Insubordination - Failure to follow a direct order or command by a supervisor; (2) Rule 5.01P Failure to follow policies and procedures; and (3) Rule 5.28P Failure

to follow work assignment or the exercise in poor judgment in carrying out an assignment.  (ECF Doc. 64-15, p. 1.)  Ms. Clifford received the notice in advance of the September 30 meeting but did not attend the meeting because she was on authorized mental health leave at the time through her employee assistance program ("EAP").  (Clifford Depo. II, 138:11-139:3, 139:23-140:3; ECF Doc. 60-26.)  The notice stated: "In the event you refuse or fail to attend the meeting, your union representative shall represent you in the matter at hand."  (ECF Doc. 64-15, p. 1.)

The September 30, 2021 pre-disciplinary meeting went forward even though Ms. Clifford was absent on disability leave, with members of the union representing Ms. Clifford.  (Ziegler Decl., p. 4, ¶ 17.)  In a report dated October 13, 2021, meeting officer Brian Forrest summarized the positions taken by management and the employee/union at the pre-disciplinary meeting, and concluded there was "just cause for discipline" based on the following:

- Evidence showed that YS Evone Clifford refused to work her assigned post and left the facility on 6/8/21; 6/10/21; 6/15/21; 6/l7/21; 6/22/21; 6/24/21; 6/29/21; 7/1/21 and 7/6/21.

- YS E. Clifford acknowledged that she refused direct orders on 6/8/21; 6/l0/21; 6/15/21; 6/17/21; 6/22/21; 6/24/21; 6/29/21; 7/1/21 and 7/6/2l and left the facility.

(White Decl. p. 2, ¶ 13; ECF Doc. 64-16.)  Mr. Forrest's summary and the sign-in sheet reflect that two union representatives attended the meeting, Mr. Wilmoth and Mr. Cooper.  (ECF Doc. 64-16.)  The union representatives argued: the past practice was for staff with the most seniority to pick where they worked in the control center; the post should have been put up for bid when the post orders changed to allow management to determine where staff worked in the control center; the pre-disciplinary meeting should have been postponed; and a step 2 grievance was on hold because Ms. Clifford was out on leave.  (*Id.* at pp. 2-3.)  Ms. Ziegler reports it is "standard practice to hold a pre-disciplinary meeting if the accused employee is unable to attend, as long as union representation can advocate for the absent employee."  (Ziegler Decl., p. 4, ¶ 17.)

A labor relations officer reviewed the Meeting Officer Report with Superintendent Darnell, recommending termination based on Ms. Clifford's prior five-day suspension and the progressive disciplinary grid found in DYS's general work rules. (Ziegler Decl., p. 4, ¶ 16). In a letter sent to Ms. Clifford via regular and certified mail on October 21, 2021, Ms. Clifford's employment with DYS was terminated effective on October 21, 2021, due to her violation of the following rules: Rule 4.01P, Insubordination; Rule 5.01P, Failure to follow policies and procedures; and Rule 5.28P, Failure to follow work assignment or the exercise of poor judgment in carrying out an assignment. (Clifford Depo. II, 142:5-11; ECF Doc. 60-29.)

### 10.    Post-Termination Actions

Ms. Clifford submitted a grievance challenging her termination on October 26, 2021. (Clifford Depo. I, 94:12-17; ECF Doc. 59-47.) The union subsequently advised Ms. Clifford that the OCSEA Discharge Review Committee had reviewed the grievance on February 23, 2022, and declined to move the grievance forward to arbitration because "the Committee determined that there was no violation of the contract" and "there is documented progressive discipline and an admission that [Ms. Clifford] repeatedly left [her] post[.]" (Clifford Depo. I, 100: 9-17; ECF Doc. 59-49.) OCSEA representatives reiterated and further explained these findings in two additional letters dated April 7 and May 23, 2022. (Clifford Depo. I, 102:9-17, 116:20-117:2; ECF Docs. 59-51, 59-53.) In the May 23 letter, OCSEA's general counsel wrote:

> Additionally, you referenced your refusal to follow a direct order and your rationale for doing so. A general rule is that employees are expected to follow management directives. If an employee believes the directive to be unfair or a violation of the contract, he/she can file a grievance at a later date.

(ECF Doc. 59-53, p. 2.) Ms. Clifford acknowledged in her deposition that these communications from the union suggest that OCSEA believed the changes to the post orders did not violate the CBA, but emphasized that neither OCSEA, the labor relations board, nor the office of collective

bargaining gave her anything in writing at an earlier point to state that the changes to the post

orders were valid and not in violation of the CBA. (Clifford Depo. I, 105:15-106:22.)

Ms. Clifford filed a charge with the Equal Employment Opportunity Commission

("EEOC") on May 4, 2022, alleging retaliation for engaging in protected activity. (Clifford

Depo. II, 16:21-7; ECF Doc. 60-6.) She alleged the particulars of her charge as follows:

> I began working for the above named Respondent in or around 1995. My most
> recent job title was Juvenile Corrections Officer.
>
> I previously filed a Charge of Discrimination against Respondent (Charge No. 22A-
> 2021-01110). I also filed three grievances and an unfair labor practice complaint
> against Respondent in 2021. On or [sic] October 21, 2021, I was discharged for
> insubordination, violation of work rules, and failure to follow work
> assignments/policies and procedures.
>
> I believe I was discriminated against in retaliation for engaging in protected activity,
> in violation of the Age Discrimination in Employment Act of 1967, as amended.

(Clifford Depo. II, 17:8-22; ECF Doc. 60-6, p. 1.) The EEOC issued Ms. Clifford a right to sue

letter on June 9, 2022. (Clifford Depo. II, 21:23-22:3; ECF Doc. 60-7.)

## II.      Standard of Review

The Federal Rules of Civil Procedure require courts to "grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56. The movant thus "bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323 (1986) (quotations omitted).

After the moving party has carried its initial burden to show that there are no genuine

issues of material fact in dispute, the burden shifts to the non-moving party. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[I]nferences to be drawn from

the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Id.* at 587 (internal quotations, citations, and alterations omitted). The non-moving party must present specific facts that demonstrate there is a genuine issue of material fact for trial. *Id.* at 587. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether summary judgment is warranted, a judge generally asks, "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id.* at 252 (internal citations, emphasis, and bracket omitted). The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247-48).

The fact that Ms. Clifford is proceeding pro se in this case does not impact the applicable standard of review. "Once a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz* and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (brackets in original) (citing *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512-13 (2002); quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)); *see also Eslinger v. City of Kent*, No. 5:18-CV-2442, 2020 WL 1904046, at *2 (N.D. Ohio Apr. 17, 2020) (stating lenient treatment of pro se litigants does not extend to summary judgment). This is because "liberal treatment of pro se pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006). Accordingly, a pro se party—like

27

any other party—cannot rely on allegations or denials in unsworn filings in opposing summary judgment. *See Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment where pro se plaintiff "failed to present any evidence to defeat the . . . motion").

### III.  Discussion

DYS argues that Ms. Clifford cannot maintain her Title VII retaliation claim because (1) she cannot establish all of the elements of a prima facie case of retaliation under the *McDonnell Douglas* standard, and (2) no reasonable jury could find DYS's legitimate, nonretaliatory reasons for disciplining and terminating her to be pretextual.  (ECF Doc. 64, p. 19; ECF Doc. 66, p. 5-12.)  Ms. Clifford does not directly address the legal standards in her pro se brief in opposition but offers her own explanations and characterizations of the evidentiary record.  (ECF Doc. 65.)  The Court will therefore consider whether Ms. Clifford has demonstrated that there exists at least a genuine issue of material fact as to whether: (1) the evidence can support a prima facie case of retaliation, and (2) DYS's stated nonretaliatory reasons for disciplining her were pretextual.

### A.  Legal Framework for Title VII Retaliation Claims

"Title VII prohibits discriminating against an employee because that employee has engaged in conduct protected by Title VII." *Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014) (citing 42 U.S.C. § 2000e–3(a)).  Under the opposition clause, it is unlawful for an employer to discriminate against an employee because she opposed a practice made unlawful by Title VII, regardless of whether the employee's opposition was set forth in a formal EEOC charge or in an internal complaint filed with her employer.  *Id*. at 729-30.

"[A] Title VII retaliation claim can be established 'either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation.'"  *Id*. at 730 (*citing Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th

Cir. 2008)).  "Direct evidence is that evidence which, if believed, *requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action."  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (emphasis in original).  In contrast, circumstantial evidence *may* permit such a conclusion based on "a series of inferences arising from plaintiff's evidence."  *Id.*

A retaliation claim that is not based on direct evidence of unlawful retaliation—as in the present case—is subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, a plaintiff has the burden to establish a prima facie case by demonstrating that: "(1) [s]he engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action."  *Laster*, 746 F.3d at 730 (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007) (citing *Abbott*, 348 F.3d at 542, and *Burlington N.,* 548 U.S. 53, 67-68 (2006))).

Once a plaintiff has met her burden to establish a prima facie case, "the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action."  *Abbott*, 348 F.3d at 542 (internal brackets omitted).  "If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action."  *Id.*  If the plaintiff can demonstrate that the "proffered, non-discriminatory reason is a pretext, then the fact finder *may* infer unlawful retaliation."  *Id.* (emphasis in original).

While the *McDonnell Douglas* framework involves burden shifting, the burden of persuasion remains with the plaintiff throughout the analysis.  *Abbott*, 348 F.3d at 542.

**B.    Scope of Title VII Retaliation Claim**

Before considering whether Ms. Clifford has identified sufficient evidence to support a prima facie claim of retaliation, it is appropriate to first clarify what alleged acts of retaliation are properly before the Court.  Ms. Clifford's termination was the only retaliatory act identified in the underlying EEOC charge of discrimination.  (ECF Doc. 60-6.)  The Amended Complaint more broadly alleges retaliatory action that includes "permitting on-going discrimination and harassment by co-workers, disciplining her and terminating her." [4]  (ECF Doc. 16-2, p. 7, ¶ 41.)  But DYS asserts in a footnote that "it is unclear whether Clifford is also alleging that the post orders were changed to retaliate against her."[5]  (ECF Doc. 64, p. 9, n. 2.)  Having considered the language in Ms. Clifford's underlying EEOC charge and the Amended Complaint, the Court sees no indication in either filing that Ms. Clifford intended to allege that DYS made changes to its control center post orders in retaliation for Ms. Clifford's protected activities.  Indeed, the protected activities identified in Ms. Clifford's EEOC charge, including her filing of an OCRC complaint of discrimination and three union grievances, demonstrably took place after—and even in response to—the already-modified post orders.  (*See* ECF Doc. 60-6.)

Additionally, the language of the EEOC charge precludes consideration of any new assertion that the post orders were changed in retaliation for Ms. Clifford's protected activities. In deciding the motions to dismiss, this Court applied the "expected scope of investigation test"

---

[4] As outlined in this Court's prior order on DYS's Motion to Dismiss, Ms. Clifford admitted to signing and filing documents as a pro se defendant even though they were drafted by an attorney who did not appear in the case.  (ECF Doc. 50, p. 2.)  In lieu of requesting relief under Fed. R. Civ. P. 11, the defendants asked only that her prior filings not be given the benefit of the less stringent pleading standards applicable to pro se filings.  (*Id.* at pp. 2-3.)  Ms. Clifford did not object to that remedy, which this Court has imposed.  (*Id.* at p. 3.)

[5] Although Ms. Clifford had an opportunity to address the issue in her brief, she did not do so.  (ECF Doc. 65.)

to find Ms. Clifford had exhausted the administrative remedies necessary to assert the present retaliation claim because her EEOC charge "explicitly alleged . . . that she was terminated in retaliation for protected activity that included the filing of a prior EEOC charge."[6]  (ECF Doc. 50, pp. 12-14.)  The "expected scope of investigation test" generally provides that a "judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination."  *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002) (quoting *EEOC v. Bailey*, 563 F.2d 439, 446 (6th Cir. 1977)).  Claims outside the "expected scope of investigation" may not be pursued in later court cases because that "would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role."  *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).

Here, Ms. Clifford's allegation in her EEOC charge that she was terminated in retaliation for filing a discrimination complaint, three grievances, and/or an unfair labor practices complaint—all which she filed, at least in part, in response to the relevant post order changes— would not reasonably put the EEOC on notice that it should also extend its investigation to consider whether the post order changes themselves were made in retaliation for some earlier, unspecified protected activities by Ms. Clifford.  Because a claim that DYS changed the post orders to retaliate against Ms. Clifford for earlier protected activities could not be reasonably expected to grow out of the factual allegations in the operative EEOC charge, no such retaliation claim is properly before this court.[7]  *See Weigel*, 302 F.3d at 380.

---

[6] For the sake of clarity, the Court notes that its review of the evidence presented on summary judgment reveals that the "charge of discrimination" referenced in Ms. Clifford's EEOC charge was actually a complaint of discrimination filed with the OCRC, not an earlier EEOC charge of discrimination.  (*See* ECF Doc. 60-3.)

[7] Even if Ms. Clifford's May 2022 EEOC charge provided adequate notice of an allegation that DYS was retaliating against Ms. Clifford for engaging in protected activity when it changed the control center post orders in February 2021, the claim would also be subject to challenge as time barred.  *See* 42 U.S.C. § 2000e-5(e)(1) (a plaintiff "shall" file her EEOC charge within either 180 or 300 days "after the alleged unlawful employment practice occurred").

The Court turns next to the question whether Ms. Clifford can establish a prima facie case of retaliation based on her challenge to the discipline that resulted in her termination.

**C.  Plaintiff Has Established a Prima Facie Case of Retaliation**

DYS does not dispute that Ms. Clifford can demonstrate the first three elements of a prima facie case of retaliation based on her discipline / termination—i.e., that she engaged in protected activity known to DYS and DYS took materially adverse employment actions; but, as to the fourth element,  DYS argues that "there is simply no evidence that 'but for' any protected activity, Clifford would not have received her five-day suspension or have been terminated." (ECF Doc. 64, p. 21; *id.* at n. 11.)  In support, DYS notes there is no dispute that Ms. Clifford "walked off the job when she was assigned to work the window in the control center on numerous occasions without leave to cover her absences in violation of a direct order."  (*Id.* at p. 22 (citing Clifford Depo. I, 70:16-25).)

Ms. Clifford asserts that "[n]one of her disciplines were for abandoning [her] Post." (ECF Doc. 65, p. 1.)  Instead, she implies she was disciplined for filing grievances and complaints, saying DYS refused her seniority rights and her requests to let prior practices remain in place until her grievance challenging the new post orders was complete.  (*Id.*; *see* Am. Compl., p. 7, ¶¶ 40-41, 44 (claiming DYS took retaliatory action, including terminating Ms. Clifford, because she filed complaints of harassment and discrimination).)

As to the specific actions that led to her discipline, she explains:

> Each of the days I was disciplined for I clocked in, on time, pulled my keys and went to roll call where I asked for my right to choose my Post based on my seniority. Each of those days, the Defendant never addressed my complaint of not feeling safe with my coworker, never allowed me to use my seniority or offered me an alternative Post. Each of those days the Defendant didn't/couldn't give me a direct order to stay for fear of hostility between me and my coworkers in the work area. Each of those days the Defendant had me, before I left, sign off on a document already prepared by the Defendant giving me a direct order to go to the assignment

they created in the Control Center and to write a statement on why I refused and why I was leaving. This was not abandoning my Post.

I did have leave time to cover all my absences. Due to the level of stress, I submitted leave requests for those days. The requests were denied because they were not submitted, timely, seven days before the requested date. The Defendants and DYS Central Office would not cite mitigating circumstance and denied them all. []

(ECF Doc. 65, p. 3 (citations omitted).)  She also highlights the following as mitigating or aggravating circumstances: (1) her coworker was not disciplined for his actions in the control room on September 2, 2020; (2) a union representative argued at her pre-disciplinary hearing in September 2021 that the post orders changes were not valid and that they denied Ms. Clifford her seniority rights; (3) the pre-disciplinary hearing was held while Ms. Clifford was out on "approved EAP disability (mental health) leave"; and (4) Ms. Clifford requested that her grievances and investigations be completed by an agency other than DYS and named DYS in her civil rights complaint before her termination.  (*Id.* at p. 4.)

To demonstrate the fourth element of a prima facie case, "a plaintiff must show that the employee's protected activity was a 'but for' cause of the employer's adverse action against her, meaning the adverse action would not have occurred absent the employer's desire to retaliate." *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).  "In other words, 'a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action' or otherwise engaged in protected activity."  *George*, 966 F.3d at 459-60 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).  A plaintiff's burden to establish a prima facie case "'is not onerous,' and can be met through 'evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.'"  *Id.* at 459 (quoting *Nguyen*, 229 F.3d at 563).

33

Temporal proximity alone may be enough to show a causal connection "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity." *George*, 966 F.3d at 460 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).  Such cases generally involve adverse employment action taken "just days or weeks from when the employer learns of the employee's protected activity." *Id.* (citing cases).  "But even if enough time passes between the protected activity and the adverse action so as to preclude a finding of causation based on the close timing alone, an employee can still prevail if she 'couple[s] temporal proximity with other evidence of retaliatory conduct to establish causality.'" *Id.* (quoting *Mickey*, 516 F.3d at 525); *see also Zarza ex rel. Zarza v. Bd. of Regents of Univ. of Mich.*, No. 22-1776, 2023 WL 3270899, at *4 (6th Cir. May 5, 2023) (quoting *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 588 (6th Cir. 2022)) ("To establish causality, plaintiffs often point to temporal proximity and some 'other evidence of retaliatory conduct.'").

Here, the following complaints of workplace discrimination constituted protected activity: a June 2020 email complaining that a third staff member was removed from other control center shifts but not her shift, even though she was "a 65 year old African American female with documented health issues"; a November 2020 internal interview where she described harassment by her coworkers in the control room as part of years of "targeting the black female staff"; a February 18, 2021 email asserting that DYS had given her post to a white male coworker with less seniority, and that she was being harassed by two coworkers based on her age and gender; a February 22, 2021 grievance asserting that she had stopped the rotation in the control center in response to harassment by a white male coworker, and that management had

then stripped her of her post and seniority to pacify her male coworkers; and a February 23, 2021 OCRC complaint of discrimination based on race, color, sex, age, and retaliation.

DYS initiated an investigation into potential insubordination by Ms. Clifford on March 10, 2021, just weeks after Ms. Clifford's internal complaint, grievance, and OCRC complaint were filed.  But the investigation was not completed until June 2021, and Ms. Clifford was notified of her five-day suspension on June 30, 2021.  This amounts to a four-month gap between Ms. Clifford's protected activities and DYS's first adverse employment action, too long for this Court to infer a causal connection between the protected activity and the adverse action based on temporal proximity alone.  *See George*, 966 F.3d at 460; *see, e.g., Kovacs v. Univ. of Toledo*, 711 F. Supp. 3d 697, 709 (N.D. Ohio), *reconsideration denied,* 737 F. Supp. 3d 635 (N.D. Ohio 2024) (finding a two week delay sufficient to satisfy a prima facie causal connection on its own, but not a four-month delay).  Ms. Clifford must thus show "other evidence of retaliatory conduct" to support a causal connection between her protected activity and her suspension.  *See George*, 966 F.3d at 460; *Bledsoe*, 42 F.4th at 588.

The same conclusion applies to Ms. Clifford's termination.  A new investigation into potential insubordination was initiated on July 6, 2021, six days after Ms. Clifford was notified of her suspension.  That investigation was completed in August 2021, a pre-disciplinary meeting was scheduled and held in September 2021, and Ms. Clifford was notified of her termination on October 21, 2021.  The eight-month gap between Ms. Clifford's internal complaint, grievance, and OCRC complaint and her termination means that she must show other evidence of retaliatory conduct to demonstrate a causal connection for purposes of establishing a prima facie claim.

As to "other evidence of retaliatory conduct," the record reflects that Ms. Clifford repeatedly complained she was targeted and harassed by male coworkers; and the October 2020

internal investigation revealed at least one coworker (OM Cunningham) who believed and echoed her complaints.  (ECF Doc. 60-12, pp. 1, 8-9, 52-54.)  To push back against perceived harassment, Ms. Clifford said she used the only thing she had going for her—her seniority—to select preferred duties in the post, at the expense of her perceived harasser.  (Clifford Depo. I, 14:21-15:1; Clifford Depo. II, 85:13-16, 89:2-7.)  In the October 2020 internal investigation, Ms. Clifford, two shift supervisors (OM Rozier and OM Jeter), and Mr. Horner all reported that the person with the most seniority at Indian River generally had the authority to choose the way duties were divided within a post.  (ECF Doc. 60-12, pp. 2, 5-6, 34-37, 46-48.)  But another manager (DD Wilson) opined as an expert in the same investigation that duties within a post should instead be "rotated in order for work to be fairly distributed."  (*Id.* at pp. 7, 49.)  The investigation found "unsubstantiated" the allegation that Mr. Horner failed to comply with instructions to work at the window and allow Ms. Clifford to work at the panel (*id.* at p. 11-12), even though that was factually what happened (*id.* at pp. 2, 34-35).  The only resulting discipline for Mr. Horner was receipt of the same workplace violence letter given to Ms. Clifford.

Shortly thereafter, the post orders for the control center were modified by DD Wilson to match the rotation he previously described in his expert opinion (ECF Doc. 64-10, p. 49), and Ms. Clifford was ordered to comply with that rotation (ECF Docs. 64-10, 64-14)  She protested this order internally and with an OCRC complaint, alleging ongoing harassment and asserting that she was stripped of her seniority to favor and/or pacify her male coworkers.  (Clifford Depo. I, 14:3-5, 55:6-25; ECF Docs. 59-4, 59-20; Clifford Depo. II, 13:18-14:13; ECF Doc. 60-3.)  When she asked that prior practices remain in place until her grievance was decided (ECF Doc. 59-4, p. 2), DYS instead ordered her to report to her duty station in accordance with the new post orders (ECF Doc. 64-10).  When she asked for vacation leave to cover the days she was ordered

to comply with the rotation, DYS exercised its discretion to deny her leave requests (Clifford Depo. II, 101:7-102:2, 102:13-103:10, 131:14-132:6) and initiated an insubordination investigation (ECF Doc. 64-10).  Once the second investigation was complete, Ms. Clifford's pre-discipline hearing was scheduled and held without her participation, even though she was on approved disability leave at the time.  (Ziegler Decl., p. 4, ¶ 17; Clifford Depo. II, 138:19-139:3.)

Mindful that Ms. Clifford's burden to establish a prima facie case "is not onerous," *George*, 966 F.3d at 459, the Court finds a reasonable jury could find a causal connection between Ms. Clifford's protected activities in June 2020, November 2020, and February 2021 and DYS's March 2021 investigation, June 2021 suspension, and October 2021 termination. Regardless of whether DYS had discretion to approach its disciplinary process in the manner it did, the question is not whether DYS acted within its rights but whether its actions could lead a reasonable jury to infer a causal connection with Ms. Clifford's prior protected activities.

The Court therefore finds that Ms. Clifford has demonstrated a genuine issue of material fact as to whether she can show a prima facie case of Title VII retaliation.

## D.    Defendant Has Articulated Legitimate, Non-Discriminatory Reasons for the Adverse Employment Actions

Even if Ms. Clifford can establish a prima facie case of retaliation, DYS argues it had legitimate, non-discriminatory reasons for disciplining Ms. Clifford.  (ECF Doc. 64, pp. 18-20; ECF Doc. 66, pp. 9-13.)  Specifically, DYS argues that Ms. Clifford's suspension and termination were warranted due to her misconduct in repeatedly walking off the job, as detailed in the internal investigation reports of June 3, 2021 and August 5, 2021.  (ECF Doc. 64, p. 23 (citing White Decl. p. 2, ¶¶ 7, 10; ECF Docs. 64-10, 64-14).)  The investigation reports and Ms. Clifford's own testimony reflect that Ms. Clifford refused direct orders to report to her post in accordance with the duty rotation required under the new post orders, instead clocking out and

leaving the premises on multiple scheduled workdays in March, June, and July 2021.  Although Ms. Clifford requested vacation leave to cover her absences and had sufficient leave available, DYS acted within its discretion in denying those leave requests as untimely.  DYS completed full investigations before imposing discipline and followed its progressive discipline schedule.

Ms. Clifford denies that she abandoned her post, arguing that the control center duty rotation imposed in the new post orders was unlawful because those changes were enacted in violation of the CBA; she says she was prepared to report to her post in the control center and maintains that her seniority entitled her to select her duty station within that post.  (ECF Doc. 65, p. 3.)  But she does not deny that she refused direct orders to report to the duty station dictated by the new post orders, that she clocked out and left the premises when she was scheduled to work in the control center, and that DYS operated within its discretion when it denied her leave requests as untimely.  The Court finds that DYS has met its burden to articulate legitimate, nondiscriminatory reasons for suspending and later terminating Ms. Clifford's employment.

**E.      Plaintiff Has Not Identified Sufficient Evidence to Show Pretext**

Since DYS has met its burden to articulate legitimate, nondiscriminatory reasons for disciplining Ms. Clifford, the burden shifts back to Ms. Clifford to demonstrate that DYS's proffered reasons for disciplining her were a mere "pretext" for retaliation.  *George*, 966 F.3d at 462.  Ms. Clifford may demonstrate pretext in multiple ways, including by establishing that the proffered reasons for her discipline: (1) have no basis in fact; (2) did not actually motivate the adverse actions; or (3) were insufficient to motivate the adverse actions.  *Abbott*, 348 F.3d at 542; *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012).  Ultimately, courts in the Sixth Circuit ask a commonsense question: "did the employer fire the employee for the stated reason or not?"  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009).

Ms. Clifford does not directly address the issue of "pretext" in her pro se brief.  (ECF Doc. 65.)  But she makes several statements that could be construed as arguments that her actions in repeatedly leaving the work site without leave, against direct orders, was not what *actually* motivated DYS's adverse actions.  She argues that: her seniority entitled her to choose her duty station within the control center; DYS violated the CBA when it modified the post orders to require rotation of duty stations instead; she reported for work on time on the specified days and wrote a statement why she was refusing to work at the duty station dictated by the new post orders; DYS did not address her complaint that she did not feel safe working with Mr. Horner; and DYS did not allow her to use her seniority or offer her an alternative post.  (*Id.*)  She also notes that DYS refused to keep the prior post orders in place until her grievance regarding the changed post orders was complete, denied her leave requests even though she had adequate leave, and conducted her final pre-disciplinary hearing while she was on disability leave.  (*Id.*)

On the whole, Ms. Clifford appears to argue that she left the work site on some days to protest an order that violated the CBA and usurped her seniority rights, and on other days because she was assigned to work with a coworker who had harassed her in the past.  And she engaged in protected activity when she challenged the new post order language, at least in part, on the basis that it gave her post to a white male coworker and/or stripped her of her post and seniority to pacify her male coworkers.

But DYS's subsequent investigation reports reflect that detailed and well-documented investigations were completed by Unit Manager Lee and Social Worker Supervisor Freeman regarding Ms. Clifford's repeated refusal of direct orders to report to a duty station within her assigned post and her decision to instead leave the facility on those days, to assess whether those actions warranted discipline under DYS's policies.  (ECF Docs. 64-10, 64-14.)  Ms. Clifford

39

participated in the investigations and was advised that her continued refusal to report to her duty station as directed could result in discipline up to and including termination.  (*See, e.g.,* ECF Doc. 64-10, pp. 3-4, 29, 41-44, 46-48; ECF Doc. 64-14, pp. 3, 5-6, 9, 17-22, 25, 30-32, 35-36, 54-58, 73-74.)  After being notified of her five-day suspension on June 30, 2021, she continued to refuse direct orders and leave the work site without approved leave on at least two additional workdays: July 1 and 6, 2021.  (ECF Docs. 60-22, 64-14.)  When the second investigation resulted in a recommendation of termination, Ms. Clifford was notified of her right to attend a pre-disciplinary meeting.  (Clifford Depo. II, 138:11-18, 139:23-25; ECF Doc. 60-26.)  She did not attend the meeting because she was on disability leave at the time, but union representatives appeared on her behalf and argued that past practices allowed staff to choose duties based on seniority and that the post should have been put up for bid after the new changes to the post orders.[8]  (Clifford Depo. II, 138:19-139:3, 140:1-3; Ziegler Depo., p. 4, ¶ 17; ECF Doc. 64-16.)

To meet her burden to demonstrate that DYS's proffered nondiscriminatory reasons for suspending and terminating her did not *actually* motivate DYS's actions, Ms. Clifford must identify evidence sufficient to support a finding that "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that [DYS]'s explanation is a pretext, or coverup."  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).  She has failed to identify evidence sufficient to meet this burden, and the Court is aware of none.

Even construing the evidence in the light most favorable to Ms. Clifford, the evidence clearly shows that she was suspended and terminated based on her admitted actions in leaving

---

[8] DYS has presented evidence that it is "standard practice" for such meetings to proceed without the accused employee so long as union representation is there to advocate for the absent employee.  (Ziegler Decl., p. 4, ¶ 17.) Ms. Clifford has not identified any evidence showing this violated policy or was otherwise improper.

the worksite during her scheduled shift without permission.  Although Ms. Clifford had made complaints of discrimination and harassment by coworkers, and may even have been spurred to leave the site in part to protest DYS's perceived failure to adequately address those complaints, she nevertheless has not identified any evidence sufficient to support a finding that DYS's *actual* reason for suspending and terminating her was retaliation for her complaints of discrimination, rather than discipline for her repeated insubordination in leaving the work premises without permission, in violation of direct orders from her supervisors.  A reasonable jury could not find based on the evidentiary record that DYS's stated reasons for disciplining and/or terminating Ms. Clifford—insubordination in leaving the worksite against orders and without leave—were "more likely than not" a pretext for unlawful retaliation in response to her prior protected activities.[9]

The ultimate question before this Court is: "did the employer fire the employee for the stated reason or not?"  *Chen*, 580 F.3d at 400 n. 4.  Based on a careful review of the lengthy evidentiary record, the Court finds Ms. Clifford has not met her burden to show that there is a triable issue of fact as to whether DYS's stated reasons for disciplining and terminating her were a pretext for unlawful retaliation.  The answer to the ultimate question in the case is yes.

---

[9] The fact that Ms. Clifford left work on two of the relevant dates because of reported safety concerns relating to her coworker, rather than her insistence on exercising seniority rights to select a preferred workstation, does not alter the analysis.  Not only does the record reflect that Ms. Clifford left the work site because of the CBA/seniority issue on most of the dates in question (ECF Docs. 64-10, 64-14), it also reflects that DYS had already conducted two detailed investigations into the same reported harassment by Mr. Horner and concluded that the evidence did not support a finding of workplace violence (ECF Docs. 59-12, 60-12, 60-13).  Ms. Clifford has not presented evidence sufficient to support a finding that DYS's actions with respect to Ms. Clifford's reported safety concerns were more likely than not based on unlawful retaliation, rather than reliance on the findings of its own internal investigations.

**IV.    Conclusion**

For the reasons set forth above, the Court **GRANTS** Defendants' Motion (ECF Doc. 64)

and dismisses Plaintiff's Amended Complaint (ECF Doc. 16-2) with prejudice.

March 3, 2025

> _/s/Amanda M. Knapp_
> AMANDA M. KNAPP
> United States Magistrate Judge